IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | | |
|---|---|---|---|
| MELISSA E. VEST, | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | Civil Action No. 5:13-cv-00067 | |
| | ) | | |
| CAROLYN W. COLVIN, | ) | | |
| Acting Commissioner of Social Security, | ) | By: | Joel C. Hoppe |
| Defendant. | ) | | United States Magistrate Judge |

## REPORT AND RECOMMENDATION

Plaintiff Melissa E. Vest brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (the "Act"). On appeal, Vest argues that the Administrative Law Judge ("ALJ") erred in finding her mental impairments nonsevere, failing to consider whether her fibromyalgia met or equaled a listed impairment, and rejecting her subjective symptoms in determining her residual functional capacity. The Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1385(c)(3), and this case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). After carefully reviewing the record, I find that the ALJ erred in finding Vest's mental impairments nonsevere and in failing to consider Vest's fibromyalgia in determining whether her impairments met or equaled a listing. Accordingly, I respectfully recommend that the Commissioner's decision be reversed and the case be remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g).[1]

---

[1] Several months after the case was fully briefed, Vest filed a supplemental motion for summary judgment. (ECF No. 21.) Vest states in the motion that she was found disabled as of August 2013 and awarded SSI based on a subsequent application for benefits and that she now seeks an award of benefits covering the period of March 15, 2007, through August 2013. A subsequent favorable decision may sometimes constitute new and material evidence such that the Court may remand

Case 5:13-cv-00067-MFU-JCH   Document 22   Filed 07/17/14   Page 1 of 57   Pageid#: 1965

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final determination that a person is not entitled to disability benefits. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence," *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a]

the case to the agency pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See, e.g.*, *Hayes v. Astrue*, 488 F. Supp. 2d 560, 564–65 (W.D. Va. June 7, 2007). But the prior ALJ decision is dated February 24, 2012, a full 18 months before the effective date of the new decision, and Vest herself states in a footnote that her "condition has declined so significantly" since the prior ALJ decision "that she filed a second claim upon which [the subsequent favorable] decision was based." These facts render the subsequent favorable decision immaterial to the issue before the ALJ in this case—whether Vest was disabled as of February 24, 2012.

factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and if not (5) whether he or she can perform other work. *See* 20 C.F.R. § 416.920(a)(4); *see also Heckler v. Campbell*, 461 U.S. 458, 460–462 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II.   Procedural History

Vest was born in 1967 (Administrative Record, hereinafter "R." 39), and during the relevant period was considered a "younger" individual under the Act. 20 C.F.R. § 416.963(b), (c). She completed high school and a year of college and has no past relevant work. (R. 39, 337, 341–42.) Vest applied for SSI benefits on March 15, 2007. (R. 301–07.) She alleges that she became disabled on September 1, 1988, due to a number of conditions including fibromyalgia, degenerative disc disease, rheumatoid arthritis, osteoarthritis, venous insufficiency, chronic obstructive pulmonary disease ("COPD"), alpha-1 antitrypsin deficiency, migraines, depression, bipolar disorder, and anxiety. (R. 16, 332, 335–36; Pl. Br. 1.) Her application was denied

Case 5:13-cv-00067-MFU-JCH   Document 22   Filed 07/17/14   Page 3 of 57   Pageid#: 1967

initially, on reconsideration, and, following a hearing, by an ALJ decision dated September 3, 2009. (*See generally* R. 157–72.)

Vest then requested that the Appeals Council review the ALJ's decision and submitted new medical evidence in support of that request. (R. 208–10.) In an order dated June 22, 2011, the Appeals Council granted Vest's request for review and remanded the case to the ALJ with orders to address the new evidence and to fully consider the cumulative effect of Vest's physical impairments, including obesity, degenerative disc disease, COPD, rheumatoid arthritis, and fibromyalgia. (R. 173–76.) On remand, the ALJ held another hearing, where Vest, two medical experts, and a vocational expert ("VE") all testified. (*See generally* R. 48–114.)

On February 24, 2012, the ALJ once again issued a decision finding Vest not disabled under the Act. (R. 13–40.) At step one, the ALJ found that Vest had not engaged in substantial gainful activity since the date of her application. The ALJ found that Vest had "the following impairments, which are severe (at least in combination): obesity, fi[br]omyalgia, a questionable history of rheumatoid arthritis, mild degenerative disc disease, osteoarthritis, mild [COPD], alpha-1 antitrypsin deficiency, venous insufficiency and a history of prescription drug abuse." None of these impairments, alone or combined, met or medically equaled the severity of a impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). (R. 16, 21–23.) The ALJ found Vest's other impairments, including her mental impairments, non-severe. (R. 16–21.) The ALJ found that Vest retained the residual functional capacity ("RFC") to perform "a modified range of light work" with postural and environmental limitations. (R. 23–39.) In reaching this conclusion, the ALJ found Vest's testimony about her symptoms not fully credible. (R. 37–38.) The ALJ then found, based on the VE's testimony, that Vest could perform work existing in significant numbers in the national economy. (R. 39–40.) Accordingly, he found Vest

4

not disabled under the Act. (R. 40.) The Appeals Council declined to revisit the ALJ's decision on April 23, 2013 (R. 1), and this appeal followed.

III. Facts

A. *Medical evidence relevant to fibromyalgia and musculoskeletal pain*

    1. *Treatment Records*

The medical records in this case are voluminous, dating back to 2001. (*See* R. 640.) Dr. Thomas Gray, M.D., Vest's primary care physician, had diagnosed Vest with rheumatoid arthritis and fibromyalgia and prescribed narcotic pain medication by December 2001. (R. 641.) Notes from 2006 indicate that her fibromyalgia and rheumatoid arthritis were stable. (R. 474–78.) In March 2007, Vest told Dr. Gray that her arthritis was a lot better and that she was walking a little more. (R. 466.) In June 2007, Vest reported getting regular exercise. (R. 462.)

Also in June 2007, Vest began seeing Dr. M. Scott Hogenmiller, M.D., at Augusta Rheumatology and Osteoporosis. (R. 635–38.) Vest reported pain in her hands, feet, neck, right wrist, right shoulder, and back. (R. 635.) Dr. Hogenmiller noted that Vest moved slowly and stiffly and walked with a cane. (R. 636.) Physical examination was normal except for mildly decreased neck range of motion and stiff neck movement, multiple tender points in the back, neck, and shoulders, 1+ lower extremity edema, minimal right-hand tenderness with Finkelstein's maneuver, and mildly limited range of motion in her shoulders. (*Id.*) Dr. Hogenmiller noted that Vest "certainly does not show any specific signs of active inflammatory arthritis" and that he could identify "no significant findings suggestive of a destructive arthritis." (*Id.*)

Vest followed up with Dr. Hogenmiller in early August. (R. 632–34.) Inflammatory arthritis lab tests showed "a C-reactive protein of 1.8 of unclear significance" and a sedimentation rate of 32, but were otherwise negative. (R. 566–69, 632.) Dr. Hogenmiller noted

5

that Vest's exam was "consistent with severe fibromyalgia with very sensitive tender points," but that she "certainly does not have a chronic destructive arthritis." (R. 632.) He prescribed hydroxychloroquine 200 mg twice a day and Flexeril 10 mg at bedtime. (*Id.*)

The following week, Vest told Dr. Gray she had been suffering a lot of pain since undergoing a liver biopsy at the end of July. (R. 560.) In October, Vest reported staying active even though she found it painful to move around. (R. 678.) Dr. Gray prescribed Lyrica. (*Id.*) In November, Vest told Dr. Gray that she was feeling better. (R. 679.) She reported that she did not notice a great deal of difference in her fibromyalgia pain from taking Lyrica, but Dr. Gray noted that she looked a lot better. (*Id.*) He instructed her to continue with methadone and Lyrica. (*Id.*)

On December 18, 2007, Vest reported having a lot of pain which was made worse by cooking and shopping. (R. 680.) She also told Dr. Gray that she had not gotten her Lyrica prescription filled. (*Id.*)

On January 10, 2008, Vest followed up with Dr. Hogenmiller. (R. 630–31.) Based on Vest's x-rays and labs, Dr. Hogenmiller indicated that "her primary diagnosis at this point really is fibromyalgia." (R. 630.) To help Vest's insomnia, Dr. Hogenmiller prescribed Lyrica 150 mg nightly. (*Id.*) Dr. Hogenmiller added that Vest's "prognosis is somewhat limited in the near future" given the extent of her pain symptoms. (*Id.*) At her follow-up visit with Dr. Gray in February, Vest complained of continued weight gain despite being "quite active." (R. 681, 785.) An x-ray in March showed mild degenerative disc narrowing in the lower lumbar spine. (R. 790.)

In March, Vest followed up again with Dr. Hogenmiller, who referred her for physical therapy. (R. 629, 791–93.) Vest successfully completed physical therapy, achieving greater range of motion and less muscle pain as a result. (R. 611–12, 791–73, 804–05.) By April 2008, Vest was taking Lyrica 150 mg twice a day. (R. 682.)

6

In June, Vest reported suffering a great deal of pain and feeling hot all the time. (R. 613.) Dr. Gray told her to continue taking methadone, Lyrica, and Xanax. (*Id.*) He also referred her for more physical therapy for her fibromyalgia, but the physical therapist indicated that she would have to join the fitness center to continue with her pool program independently. (R. 613–14.)

On August 12, 2008, Dr. Gray noted that Vest was "doing much better" despite continued chronic pain. (R. 683.) She had lost 11 pounds and had been walking daily and seeing her nutritionist. (*Id.*) In September, Vest told Dr. Gray that she had been walking instead of going to the pool, which had closed on Labor Day, and was experiencing more swelling in her legs as a result. (R. 685.) That same month, Vest told her pulmonologist, Dr. George Verghese, M.D., that she was walking more, but that she was still limited by shortness of breath and swelling in her feet. (R. 626.) She estimated that she could walk half a mile in 30 minutes. (*Id.*)

Vest followed up with Dr. Gray and Dr. Hogenmiller in November. On November 4, Dr. Hogenmiller noted that Vest reported that her pain was a 3 on a 1–5 scale, and he administered trigger point injections. (R. 816.) On November 12, she told Dr. Gray that she was trying to go to exercise class, but was only able to get there six to eight times per month. (R. 821.) She added that exercise made her sore, but that she wanted to continue exercising "because she knows it is good for her diabetes"; Dr. Gray gave her oxycodone to take after exercise sessions. (*Id.*) The following month, she told Dr. Verghese that she was not exercising as much anymore because of problems with back pain that occurred when she was exercising in the gym. (R. 882–84.)

On January 13, 2009, Vest told Dr. Hogenmiller that her neck and shoulder pain had gotten worse from shopping and wrapping gifts over the holidays. (R. 812.) Dr. Hogenmiller administered trigger point injections and sent her for a thoracic spine x-ray, which showed mild degenerative disc disease. (R. 812, 1118.) At her February follow-up visit with Dr. Gray, Vest

reported going to Curves "on a daily basis trying to work out and lose weight," although she had put on five pounds since November. (R. 820.) She also requested an injection for back pain. (*Id.*)

On March 2, 2009, Vest reported pain in her left hip, shoulders, upper arms, and lower back. (R. 810.) Dr. Hogenmiller diagnosed hip bursitis, administered a steroid injection, and referred her for additional injections for her lower back pain. (*Id.*) He also noted that Vest's fibromyalgia was severe and that she was unable to work. (*Id.*)

Vest saw Dr. Edward Eisenberg, M.D., on March 12 and April 4 for epidural steroid injections at L5-L6. (R. 1109–10.) At her second visit, Dr. Eisenberg noted "dramatic improvement" in her lower back pain and that her lower extremity pain was "basically resolved." (R. 1107.) Vest still reported mid-back pain that was aggravated by lifting, bending to pick up items, and vacuuming. (*Id.*) Dr. Eisenberg noted only mild degenerative disc disease based on thoracic spine x-rays. (R. 1107-08.) An MRI of her lumbar spine "was not that dramatic itself either." (R. 1107.)

In April, Vest complained of painful headaches and told Dr. Gray that she had stopped taking Lyrica. (R. 1563–64.) Dr. Gray told her to restart Lyrica and also gave her Percocet. (*Id.*)

On June 1, Vest called Dr. Gray's office complaining that she had been bed-ridden for five days with body aches and pains. (R. 1561–62.) Dr. Gray advised her to get out of bed and move around. (*Id.*) In July, Dr. Gray noted that Vest was "doing fairly well." (R. 1559–60.)

On November 25, 2009, Vest complained of pain "all over," particularly in her lower back radiating to her left leg. (R. 1543–44.) Dr. Gray prescribed Cymbalta to treat her depression and fibromyalgia. (*Id.*) Vest again reported pain and depression the following month. (R. 1541–42.) She described her pain as "extreme," but added that the Cymbalta may have helped. (*Id.*) Dr. Gray gave an injection of Phenergan and Demerol for Vest's back pain. (*Id.*)

A lumbar MRI taken in January 2010 showed a central bulge at L5-L6 without significant disc herniation, unchanged from December 2008. (R. 1081.) On January 20, Vest received a steroid injection at L5-L6. (R. 1073–74.) The next day, Vest told Dr. Gray she was suffering severe back pain radiating down her leg, especially after the injection. (R. 1539, 1771.) Vest admitted taking extra medication to relieve the pain, and Dr. Gray refilled her methadone a couple of days early. (*Id.*) Vest received another steroid injection on February 3. (R. 1062–63.)

On February 21, Vest again reported "wide spread pain" and "significant lower back pain," along with depression and insomnia. (R. 1538, 1770.) Dr. Gray refilled her methadone, but noted that Vest "seems to run out a day or two early" even though she denied taking extra. (*Id.*) He increased her Neurontin dosage to 300 mg per day. (*Id.*)

Vest complained of "increasing pain" at her March follow-up visit with Dr. Gray and reported taking two oxycodone in the morning with her methadone. (R. 1769.) Dr. Gray refilled her methadone and wrote another prescription for oxycodone. (*Id.*)

In April, Vest began seeing a psychiatrist, who increased her dosage of Cymbalta. (R. 1768.) She also saw Dr. Verghese, who administered a six-minute walk test that showed "mildly reduced" walk distance of 300 yards. (R. 870–72.) A week after seeing Dr. Verghese, Vest told Dr. Gray that a knee injury caused her to be less active. (R. 1765.)

In May 2010, Vest again complained to Dr. Gray of lower back pain radiating down her left leg, which had recurred after subsiding somewhat following a steroid injection. (R. 1763.) Dr. Gray noted that she was "in a little better spirits," refilled her methadone, and also prescribed oxycodone. (*Id.*) Five days later, Vest told Dr. Hogenmiller that her pain was a 3.5 out of 5 and was worse with movement. (R. 1574–76, 1602–04.) However, her primary complaint was swelling in her lower extremities. (*Id.*) The following month, she rated her pain a 4 out of 5.

Case 5:13-cv-00067-MFU-JCH   Document 22   Filed 07/17/14   Page 9 of 57   Pageid#: 1973

(R. 1571–73, 1599–1601.) Dr. Hogenmiller noted weight gain due to decreased activity and also noted his suspicion that her lower extremity pain was "mostly neuropathy." (*Id.*) He discussed treatment options for neuropathy with Vest, but she did not want to make any adjustments. (*Id.*)

On July 2, 2010, Dr. Gray noted that Vest had had a "rough month." (R. 1759–60.) Vest told Dr. Gray that she took some extra methadone and oxycodone for her chronic pain; Dr. Gray refilled these two prescriptions three days early. (*Id.*) He also refilled her Klonopin prescription early, as Vest claimed her mother stole those pills. (*Id.*)

Vest followed up again with Dr. Gray on July 20. (R. 1758.) She reported visiting the ER for chest pain while on vacation in Virginia Beach. (*Id.*) On August 2, Vest complained of a lot of pain. (R. 1756–57.) She admitted to taking extra methadone to make up for stopping oxycodone, which she was afraid to take after her episode of chest pain. (*Id.*) Dr. Gray refilled her methadone early and encouraged her to try oxycodone for breakthrough pain. (*Id.*)

On August 19, Vest followed up with Dr. Hogenmiller. (R. 1568–70, 1596–98.) She reported sharp, burning pain in her legs and feet that she rated a 5 out of 5. (*Id.*) Dr. Hogenmiller suspected that her lower extremity sensory neuropathy might be related to her diabetes. (*Id.*) Vest reported that her increased Neurontin dose was not as helpful as she would have liked and complained about significant nighttime pain. (*Id.*) She asked about Topamax for her symptoms, but Dr. Hogenmiller preferred to leave neuropathy therapy options to her primary care provider. (*Id.*)

On September 20, Vest called Dr. Gray's office to complain that oxycodone was not helping with breakthrough pain; Dr. Gray responded that her current narcotic pain medication regimen "will have to do." (R. 1753.) At her follow-up visit on September 30, Vest continued to complain of lower back pain radiating down her left leg to her foot, and reported that oxycodone

provided little relief. (R. 1752.) Dr. Gray noted that she seemed "somewhat more upbeat" although Vest complained of severe depression and anxiety. (*Id.*)

Vest had mitral valve replacement surgery in early October 2010. (R. 846–58.) On October 27, 2010, Dr. Gray noted that Vest was doing much better. (R. 1750.) Her weight had dropped, she had stopped smoking, and swelling in her legs had decreased. (*Id.*) Vest reported that the hospital decreased her methadone, but that she began taking 60 mg daily again after she was released. (*Id.*) On November 19, 2010, Dr. Gray noted that Vest was in no apparent distress and that her fibromyalgia was stable. (R. 1749.)

On December 7, Vest reported to Dr. Hogenmiller that her pain was a 4 out of 5. (R. 1567.) The same day, she told Dr. Gray that she had begun taking Neurontin for pain several times per day. (R. 1746.) Dr. Gray had her discontinue the daytime doses and just take 300 mg at bedtime. (*Id.*) Ten days later, she called Dr. Gray to complain that her pain medication was not working; Dr. Gray refused to prescribe additional narcotics. (R. 1745.)

Vest saw Dr. Gray on February 18, 2011, for complaints of pain and swelling in her legs. (R. 1742.) She noted that her psychiatrist had prescribed Topamax for weight loss and mood stabilization. (*Id.*) Dr. Gray took her off Neurontin and prescribed Trileptal 150 mg twice a day. (*Id.*) Vest called Dr. Gray's office twice between February and April with complaints of breakthrough pain; each time Dr. Gray prescribed Vicodin. (R. 1740–41.)

On April 5, Vest reported that her pain was significantly worse and rated it a 5 out of 5. (R. 1591–93.) She complained of pain throughout her body and stated that she was off of her meds completely. (*Id.*) Dr. Hogenmiller suggested restarting Neurontin, unless another treating physician objected. (*Id.*) Seven days later, Vest saw Dr. Gray for complaints of edema in her legs and neuropathic pain that had gotten worse since she restarted Neurontin the previous week and

switched her antidepressant from Cymablta to Pristiq. (R. 1738.) Dr. Gray had her discontinue Neurontin and restart Trileptal and suggested that she talk to her psychiatrist about Topamax. (*Id.*) Six days after that, on April 18, Vest returned to Dr. Gray with complaints of leg pain that interfered with her sleep. (R. 1737.) Dr. Gray increased her Trileptal to 300 mg twice a day and her methadone to 80 mg daily and gave her a shot of Demerol and Phenergan. (*Id.*) On April 27, Vest called Dr. Gray's office complaining of pain and requesting that Dr. Gray call in a prescription for something stronger than Vicodin. (R. 1736.) Dr. Gray replied that he could not call in anything stronger than Vicodin and added that Vest may need to try Lyrica again. (*Id.*)

Vest reported feeling much better at her May 6 follow-up visit with Dr. Gray. (R. 1731.) Her swelling and lower extremity pain had decreased, and she was no longer taking either Trileptal or Neurontin. (*Id.*) However, she reported that her overall pain had increased because of the weather. (*Id.*) Dr. Gray refilled her methadone prescription and prescribed oxycodone as needed for breakthrough pain. (*Id.*) Later that month, Vest told Dr. Gray that she had been exercising three hours per day on her elliptical trainer. (R. 1730.)

In August, Vest followed up with both Dr. Hogenmiller and Dr. Gray. Dr. Hogenmiller noted 1+ edema in her legs and multiple tender points. (R. 1829.) Vest told Dr. Gray that she still suffered from pain despite methadone and oxycodone and asked for something stronger than oxycodone. (R. 1795–96.) Dr. Gray refilled her methadone and oxycodone. (*Id.*)

Vest returned to Dr. Gray's care on October 12, 2011, with complaints of increasing pain. (R. 1789–90.) She told Dr. Gray that oxycodone was not helping and requested something stronger. (*Id.*) Dr. Gray increased her methadone dosage to 90 mg per day and recommended Flexeril 10 mg three times per day, but advised her that he felt "further escalation of her narcotics is [not] needed or warranted." (*Id.*)

At a follow-up visit on December 6, Vest again reported "severe amounts of pain" and complained that her medications were ineffective. (R. 1786.) Dr. Gray refilled her methadone, but not her oxycodone. (*Id.*) Two days later, Vest called in asking for oxycodone. (R. 1785.) Dr. Gray refilled her oxycodone at her next visit. (R. 1782–83.)

   2.  *Opinions*

The record also contains opinions from Vest's treating physicians. The most comprehensive of these is a Fibromyalgia Residual Functional Capacity Questionnaire completed by Dr. Hogenmiller on January 26, 2009. (R. 834–39.) On the questionnaire, Dr. Hogenmiller indicates that Vest has fibromyalgia, degenerative disc disease, and osteoarthritis and that her prognosis is poor. (R. 834.) Her symptoms include nonrestorative sleep, chronic fatigue, anxiety, panic attacks, depression, and daily pain in all parts of her body. (R. 834–35.) Her back pain improves with rest, but her fibromyalgia pain does not. (*Id.*) Her pain is worsened by changing weather, fatigue, movement or overuse, cold, stress, hormonal changes, or staying still. (*Id.*) Her medications cause side effects including drowsiness, dizziness, constipation, abdominal pain, weight gain, and cognitive difficulties. (R. 836.)

According to Dr. Hogenmiller, Vest's impairments cause devastating functional limitations. She cannot focus enough to perform even simple tasks, and she cannot tolerate even "low stress" jobs. (R. 835–36.) She can walk only 20 yards without rest or severe pain. (R. 836.) She is incapable of sitting or standing and walking for more than two hours per day. (*Id.*) If required to sit at work, she would have to be allowed frequent breaks to stand up or walk. (R. 837.) She would need many unscheduled breaks to lie down during the work day. (*Id.*) Sometimes, she would have to lie down for the entire day. (*Id.*) She can never lift even less than 10 lbs, twist, stoop or bend, crouch, climb ladders or stairs, look up or down, turn her head left or right, or hold her head in a static position. (*Id.*) She can perform manipulative activities only 1%

of the time during an eight-hour workday. (R. 838.) And she would have more than four "bad days" per month which would cause her to miss work. (*Id.*)

Dr. Hogenmiller also drafted a letter dated December 31, 2010, in which he indicates that Vest's "condition is severe" and recommends she be on disability "due to the severity of her pain, the level of exacerbation of this pain that she experiences with even mild activity and the inherent concentration difficulties associated with this level of pain." (R. 1566.)

On December 13, 2010, Dr. Gray wrote a letter "in support of [Vest's] application for disability." (R. 1537.) He briefly recites her medical conditions and concludes, "I do not see it possible for you to be employed in any capacity and I do feel that you are totally disabled." (*Id.*)

At the second hearing, Dr. H. C. Alexander, a board-certified rheumatologist, provided expert testimony about Vest's physical impairments. (*See generally* R. 76–103, 253–55.) Dr. Alexander initially accepted Dr. Hogenmiller's diagnosis of fibromyalgia. (R. 80.) However, he later testified that "the management [of Vest's fibromyalgia] has not been by a rheumatologist" and also objected to her treatment with narcotic pain medication. (R. 87.) Dr. Alexander identified the recommended treatment for fibromyalgia as "pain control amelioration" using antiepileptics, antidepressants, and NSAIDS; a program of non-resistive exercise; and "strong counseling toward a positive getting their life back attitude"—things he "didn't see" in Vest's treatment records. (R. 87–88.) On cross-examination, Dr. Alexander testified that he did not "disagree" with Dr. Hogenmiller's treatment "because [Dr. Hogenmiller] didn't treat her." (R. 92.) When asked if he disagreed "with the treatment of [Vest's] fibromyalgia[,] period," Dr. Alexander replied, "No, I don't disagree with it, I just pointed out that the only treatment I saw was methadone." (*Id.*)

Dr. Alexander also testified on cross-examination that he did not consider whether Vest's fibromyalgia met or equaled a listing because he did not "think there is a[n] … appropriate listing to use as an equals" for fibromyalgia. (R. 94.) He explained that he did not consider fibromyalgia in assessing Vest's limitations because fibromyalgia is "a subjective pain condition" and "I am not allowed … to include subjective symptoms in the absence of … documented weakness or objective evidence for diminished function." (R. 93, 100.) On further questioning, Dr. Alexander admitted that "by definition" such objective evidence would not exist for any fibromyalgia patient.[2] (R. 100–01.) He also admitted that Vest's clinical presentation was consistent with fibromyalgia patients he has encountered. (R. 101.) When the ALJ asked Dr. Alexander to clarify his reason for not considering fibromyalgia, Dr. Alexander replied that he relied not on the lack of objective evidence of functional limitations but the "large base … of evidence that [fibromyalgia patients] do not have significant incapacitation of their daily activities." (R. 102.) However, he added that some fibromyalgia patients do have functional limitations, not necessarily from pain itself but from "pain avoidance." (R. 102–03.)

B.  *Medical records relevant to mental health conditions*

1.  *Treatment notes*

By early 2002, Vest had been diagnosed with depression and was taking Effexor. (R. 645.) In March and May of that year, Dr. Gray noted depression with borderline personality disorder. (R. 647–48.)

At her August 2004 visit with Dr. Gray, Vest asked for an antidepressant and something for her anxiety. (R. 675.) Dr. Gray noted that Vest was "anxious" and reported feeling "insecure"

---

[2] Dr. Alexander did indicate that MRI scans demonstrating "changes in certain parts of the brain associated with stimulating a person in different sites" might objectively demonstrate fibromyalgia. (R. 101.)

Case 5:13-cv-00067-MFU-JCH   Document 22   Filed 07/17/14   Page 15 of 57   Pageid#: 1979

and "depressed." (*Id.*) Dr. Gray prescribed Lexapro 10 mg daily. (*Id.*) In November 2004, Dr. Gray prescribed Xanax for anxiety-related chest pains. (R. 496.)

In April 2005, Dr. Gray noted that Vest appeared depressed. (R. 486.) The following month, Dr. Gray noted that Vest was "somewhat depressed appearing," but in no apparent distress. (R. 485.) In July 2005, Vest complained of lack of energy, insomnia, and continued problems with depression. (R. 483.) Vest called Dr. Gray's office in September 2005 asking for Xanax for her nerves; Dr. Gray called in the prescription to the pharmacy. (R. 677.)

In April 2006, Vest reported being under a lot of stress following her son's suicide attempt. (R. 476.) Dr. Gray noted anxiety disorder and depression and refilled her Xanax prescription. (*Id.*) In August, Dr. Gray noted that Vest's anxiety and depression were "about the same as previously." (R. 474.) In October, Vest reported to Dr. Gray that she was still having a lot of anxiety about her son; Dr. Gray noted her depression and anxiety were stable. (R. 470.)

In December 2007, Vest reported to Dr. Gray that her anxiety was "at high levels" and requested more Xanax. (R. 680.) In February 2008, Dr. Gray noted that she was doing well on Wellbutrin; two months later, she asked Dr. Gray about increasing her dose. (R. 681–82.)

On June 4, 2008, Vest reported to Dr. Gray that she was feeling more depressed. (R. 613.) That same day she began seeing licensed clinical psychologist Dr. Gerald McKeegan, Ph. D. (R. 1532–34.) Vest saw Dr. McKeegan on a regular basis between then and December 2010, when the treatment notes end. (*See generally* R. 1426–1534, 1621–91.) Unfortunately, Dr. McKeegan's notes are difficult to read. Treatment notes from 2008 and 2009 show that Vest frequently demonstrated depressed and anxious affect and occasionally reported impaired concentration, low energy, anhedonia, and disturbances in sleep, appetite, or libido. (*See generally* R. 1464–1534, 1640–90.) Vest often reported concerns about her family situation,

including her unstable marriage, declining financial security, and feelings that she was inadequate as a mother and that her family did not appreciate her. In August 2008, Vest told Dr. Gray that her visits with Dr. McKeegan were "doing wonders for her" and that she was beginning to take control of her life. (R. 683.) In February 2009, Vest told Dr. Gray that she was under "a lot of stress and anxiety … primarily about her son." (R. 820.) Dr. Gray noted that her depression and anxiety were stable. (*Id.*)

Dr. McKeegan's records from summer 2009 indicate that Vest was dealing with family problems including her husband's alcoholism. (*See* R. 1476–87.) In June, Dr. McKeegan began to suspect bipolar disorder and noted "definite bipolar II" in treatment notes for June 30. (R. 1484, 1674.) In July, Vest told Dr. Gray that as to her depression, she was doing "quite well." (R. 1559–60.)

In November, Dr. Gray noted that Vest was "tearful" and "depressed" and struggling with medical, financial, and family-related problems. (R. 1543–44.) In December, Dr. Gray noted that complaints of chest pains on exertion might be related to Vest's anxiety. (R. 1541–42.)

In January 2010, Vest told Dr. Gray that she had a rough time after running out of Cymbalta and Xanax. (R. 1539, 1771.) The following month, Dr. Gray noted that Vest continued to be quite depressed and anxious. (R. 1538, 1770.) He also noted that Vest's psychologist wanted her on a different depression medication and talked to her about a mood stabilizer. (*Id.*) Dr. Gray increased her dosage of Neurontin and continued her on Klonopin, Cymbalta, and Wellbutrin. (*Id.*) In March, Vest complained to Dr. Gray of continued anxiety. (R. 1769.) Dr. Gray noted "severe" anxiety and stress disorder as well as depression and recommended that she see a psychiatrist in conjunction with her psychologist, Dr. McKeegan. (*Id.*)

Vest began seeing a psychiatrist in April 2010. The record does not contain any of the psychiatrist's notes, but we know from Dr. Gray's notes that Vest's psychiatrist increased her Cymbalta and that Vest did not feel like she tolerated the increased dosage well. (R. 1768.) The following month, Dr. Gray noted that Vest was "in a little better spirits." (R. 763.) However, in June, he noted that she was "quite depressed" and fixated on her weight. (R. 1761.)

Also in April 2010, Dr. McKeegan began using a different form to record treatment notes and began assigning Vest Global Assessment of Functioning ("GAF") scores at each visit. (R. 1633.) Treatment notes contain 26 GAF scores, ranging from 57 to 79, between April 2010 and December 2010, when Dr. McKeegan's treatment notes stop. (*See generally* R. 1426–57.) Two of the scores are in the 50's and twelve each are in the 60's and 70's. (*Id.*) Dr. McKeegan's treatment notes from this period reflect consistent reports of depression and anxiety as well as ongoing family problems. (*Id.*) Particularly in June and July, Vest also frequently complained of low energy, libido, motivation, and interest, as well as anhedonia, difficulty concentrating, memory problems, and problems sleeping. (*See* R. 1444–54.) During those two months, Dr. McKeegan often noted that Vest demonstrated constricted, irritable, or labile affect, tearful or agitated behavior, and pressured, excessive or rapid speech. (*See id.*) Dr. McKeegan provided a diagnosis of major depressive disorder recurrent for almost all of these visits. (*Id.*)

Vest called Dr. Gray in September to tell him that her psychologist wanted to switch her from Klonopin back to Xanax. (R. 1754.) On September 30, Dr. Gray noted that Vest "seem[ed] somewhat more upbeat" despite continued reports of depression and anxiety. (R. 1752.)

Dr. McKeegan's treatment notes for November and December 2010 reflect continued complaints of anxiety and depression, but less frequent reports of other symptoms than in his June and July notes. (*See* R. 1426–41.) Starting on November 19, Dr. McKeegan began noting

Vest's diagnosis as "bipolar [disorder]/depressed" instead of major depressive disorder. (R. 1425–35.) In treatment notes from late November and early December, Dr. McKeegan noted self-esteem problems and encouraged Vest to challenge her self-blame cognition. (R. 1432–34.) On December 21, Vest reported feeling stressed again about the holidays. (R. 1426.) Dr. McKeegan's treatment notes end at this point. However, Dr. Gray's treatment notes indicate that, in April 2011, Vest's psychiatrist prescribed Topamax and switched her from Pristiq back to Cymbalta. (R. 1736–37.)

    *2. Opinions*

    On October 28, 2008, Dr. McKeegan wrote a letter to Vest's attorney that he described as a "summary of [his] clinical impressions of Melissa Vest." (R. 716–17.) In the letter, Dr. McKeegan states that Vest "presents as an anxious and depressed individual," with "some rapid and pressured speech" and complaints of "irritability, difficulty concentrating and making decisions, and periods of extreme lack of energy and motivation to do her daily activities." (R. 716.) She shows "no frank symptoms of disorganized thinking," but is sometimes slow to respond to questions because she is preoccupied with her problems at home. (*Id.*) Vest often blames herself for others' problems and undertakes "frantic efforts to 'make it alright.'" (*Id.*)

    Dr. McKeegan noted that Vest described a history that included a "chaotic childhood and adolescence" marked by abandonment by her mother, "parentification" (*i.e.*, taking care of younger siblings in a maternal role), and sexual abuse. (R. 717.) Dr. McKeegan opined that Vest's history caused her to have "very rigid perceptions of what she needs to do to be a good mother and wife." (*Id.*) When her "driven-like" efforts fall short, she first becomes angry at others and yells at them usually over small things (*e.g.*, when her daughter leaves a cup on the counter), and then blames herself and becomes depressed and withdrawn. (*Id.*) When she is depressed, she "stay[s] on her couch for days" and lacks the energy to change her clothes. (*Id.*)

Dr. McKeegan indicated a diagnosis of "Major Depressive Disorder, moderate severity, without psychotic features," but stated that he was also considering a diagnosis of Bipolar II Disorder. (*Id.*) He opined that Vest "would be significantly impaired in her ability to carry out complex instructions and task demands" and that "her psychiatric and physical conditions would significantly impair her ability to remain on any job that requires concerted effort and concentration." (*Id.*) He explained, "[a]t present, she has difficulty in completing mundane tasks at home" during her depressive periods. (*Id.*) He noted that "although [Vest] has very good superficial social skills" and could "initially … 'get along with others,'" she could become "irritable and problematic with her co-workers" if any difficulty ever arose. (*Id.*)

On June 7, 2009, Dr. McKeegan wrote another letter to Vest's attorney providing "an update of [his] clinical impressions of Melissa Vest." (R. 841.) He reaffirmed his previous summary and added that Vest "continues to display periods of activity in which she 'pushes' herself to take care of cris[i]s situations in life[,] … followed by period[s] of depression marked by social isolation, not speaking to anyone in her family, not leaving the house, not cooking for her children, and not wanting to be touched or hugged by her children." (*Id.*) Vest is aware of these emotional swings and keeps microwavable meals for her children to eat when she is depressed. (*Id.*) During Vest's active periods, she would skip from topic to topic at their sessions. (*Id.*) "During her periods of depression, [Vest] is quiet, moves slowly, has no facial expression," demonstrates delayed response, and "complains of pain and sleeplessness." (*Id.*) She would also miss appointments, only to call back a few days later to apologize and re-schedule. (*Id.*) Based on these observations, Dr. McKeegan was "more convinced" that Vest suffered from "Bipolar II Disorder in which she has periods of depression and periods of hypomania." (*Id.*) Dr. McKeegan reaffirmed the limitations imposed by Vest's mental disorder. (R. 841–42.)

On January 15, 2010, Dr. McKeegan sent Vest's attorney "an addendum of [his] clinical impressions of Melissa Vest." (R. 1423–25.) He noted that Vest had revealed possible previous episodes of post-partum depression, for which she did not seek treatment. (R. 1424.) Dr. McKeegan noted that research has shown that untreated episodes of clinical depression may make an individual at increased risk of further episodes, and that this likely happened to Vest, "probably beginning in her young adolescence." (*Id.*)

Dr. McKeegan indicated that Vest's family situations over the past year, including her husband's unemployment, have "resulted in severe stress and … anxiety" and made it more difficult for her "to deal effectively with life." (*Id.*) Vest had reported becoming increasingly irritable and physically assaulting her husband, whom she blames "for putting her and her children 'at risk.'" (*Id.*) She had also "experienced severe anxiety, characterized by panic attacks (complicated by her COPD) and what can be described as moments of depersonalization (*i.e.*, feeling as if she was observing herself and what she was doing was not real or part of her)." (*Id.*) Dr. McKeegan indicated that he changed his diagnosis to "Bipolar Disorder, Type II and Anxiety Disorder NOS." (*Id.*) He added that Vest was taking the antidepressant duloxetine to "assist in stabilizing her mood and help with her chronic pain." (*Id.*) Dr. McKeegan reiterated his opinion that Vest would be unable to work. (R. 1425.)

Dr. McKeegan sent his last letter to Vest's attorney on December 24, 2011, summarizing his "clinical impressions of Melissa Vest over the past two years." (R. 1822–24.) Dr. McKeegan indicated that the "most significant event" in Vest's life since his June 2009 letter was her October 2010 heart valve surgery. (R. 1822.) The physical problems she had prior to this surgery "exacerbated her depression and anxiety over that period," rendering her "basically … 'non-functional' at home." (*Id.*) Since then, Dr. McKeegan noted, Vest "has attempted to 'take

control' of her health" by stopping smoking and getting more exercise; however, she still experiences depression and anxiety and worries that she will not live past her mid-40s. (*Id.*) In the past six months, Vest reported having several "depersonalization/derealization event[s]," which are triggered by "any stress—such as the clerk at a store not calculating the correct price for a sale." (*Id.*) Vest continued "to present with … irritability, difficulty concentrating and making decisions, and periods of extreme lack of energy and motivation to do her daily activities of daily living," symptoms that Dr. McKeegan indicated could be related to post-traumatic stress. (R. 1823.) Dr. McKeegan added that he had diagnosed Vest with "Bipolar II Disorder" and that Vest was taking an antidepressant "to assist in stabilizing her mood." (*Id.*)

Dr. Robert Muller, an independent licensed clinical psychologist, testified at the second hearing. (*See* R. 104–07.) Dr. Muller summarized Dr. McKeegan's treatment notes as follows:

> [I]n September 2008 she's dealing with relationship issues, more depressed in December and then sort of an up or down case. In 11/08 she's more stable and then he starts using GAF scores from June 2010 through the year and he's got GAF scores in the high sixties, the low seventies which would indicate more mild to moderate symptoms in terms of severity.

(R. 105.) Based her medical records, Dr. Muller testified that Vest "certainly has some issues with depression and anxiety" and that "[i]t looks like there may be a bipolar disorder." (R. 106.) However, he concluded that her symptoms were not so severe as to meet or equal a listed impairment. (*Id.*) As for Vest's RFC, Dr. Moeller testified that he believed Vest capable of performing "simple, repetitive tasks in a low stress environment with minimal contact with the general public"—in other words, non-production-rate work. (R. 106–07.)

The ALJ then observed that "there is kind of a disconnect between the GAF scores that Dr. McKeegan has been giving her and what he's saying about her" in his letters, because "high sixties and low seventies [is] usually … pretty mild." (R. 107.) Dr. Moeller agreed that the GAF scores reflected "pretty mild … to moderate kind of stuff." (*Id.*) The ALJ responded, "It's almost

like … you don't have a severe impairment at all. … [U]nder the GAF scores there wouldn't be any really functional limitations, right?" (*Id.*) Dr. Moeller agreed that there was some tension between Dr. McKeegan's letters and his treatment notes, but he never opined that Vest did not have a severe mental impairment. (*See id.*) Instead, he repeated his assessment that Vest "can at least do simple, repetitive tasks in a low stress environment with minimal contact with the public." (*Id.*)

### C. Vest's testimony

At the first administrative hearing, Vest testified that she was living with her 16-year-old (youngest) son and 13-year-old daughter. (R. 124.) Her son had subsequently moved out, but returned a week before the second hearing. (R. 60.) She had been estranged from her husband since around 2007. (R. 69.) Vest explained that she had not worked for most of her adult life because she married at a young age and since then had been caring for her oldest son who has cerebral palsy. (R. 125, 135, 149.) He had moved out in 2008 and, at the time of the first hearing, was living with his girlfriend. (R. 60, 69, 124, 135.)

Vest reported suffering from COPD, alpha-1 antitrypsin deficiency, fibromyalgia, diabetes, arthritis, post-traumatic stress disorder (relating to her oldest son's 2004 and 2006 suicide attempts), depression, and sleeping disorders. (R. 127.) When asked at the first hearing what prevented her from working, Vest responded, "I hurt, I hurt so bad." (*Id.*) At both hearings, she compared her fibromyalgia to being hit by a baseball bat all over her body. (R. 55, 127.) Her fibromyalgia also causes fatigue. (R. 128.) At the second hearing, Vest reported that her fibromyalgia had gotten worse. (R. 55.) She testified that her condition was "horrible" and that she did not see her fibromyalgia getting any better. (R. 67.)

Vest testified that her impairments, especially fibromyalgia, have a significant impact on her life. She cannot do her hair so she gets it cut shorter; she cannot manage buttons or zippers so

she wears clothes without them. (R. 64, 67–68, 128.) Sometimes, she goes four or five days without showering because getting out of the shower is painful. (R. 64, 131.) At the first hearing, she testified that she could prepare only one full homemade meal per week when she used to cook four. (R. 128.) At the second hearing, Vest reported eating even more microwavable meals. (R. 61.) Her mother and children help with chores. (R. 61, 128–29.) She tries to do chores when she can, but is usually limited to "straightening" things up or making beds. (R. 63, 65, 130.) While doing chores, she has to take breaks to rest, and she cannot vacuum or scrub floors. (R. 61, 63, 65.) Her children and estranged husband also help her with grocery shopping, and she has to use a wheelchair to shop. (R. 63–64, 74.) At the first hearing, Vest testified that she usually drove a car about two days per week, typically to attend school events. (R. 141.) These trips would run about seven miles and about ten minutes each way. (*Id.*) She estimated at the first hearing that she could sit in a chair for ten minutes before having to get up to walk. (R. 133.) She has no hobbies; she used to enjoy reading, but no longer could read due to vision problems. (R. 142.)

Vest testified that fibromyalgia also interfered with her mental functioning. At the first hearing, she indicated that she could not concentrate for very long when she was in pain. (R. 131.) While testifying at the second hearing, she reported having a "fibro fog." (R. 70.) Vest explained that "fibro fog" affects her ability to remember things and interferes with tasks like paying bills. (R. 73–74.) She indicated that it might also cause her to be unable to remember specific dates during her testimony. (R. 75.)

Vest testified that her pain varied over time. At the first hearing, she explained that she has "a bank of energy" that she would deplete if her children had an activity or a friend coming over. (R. 129–30.) Sometimes, she pushes herself too hard and gets a "flare-up." (R. 130.) When

this happens, she is "down for like three or four days" and "can't do anything." (*Id.*) At the second hearing, Vest testified she has about as many "good" days as "bad" days. (R. 65.) A good day for her involves being "able to do a chore and complete it." (R. 65.) On her bad days, she cannot get up off the couch at all, even to get something to eat. (*Id.*)

Vest also reported that her medical conditions interfere with her sleep. She testified at the first hearing that she had slept sitting up on the couch for the past eight years and that she was afraid to lie down to sleep because getting up is painful. (R. 134.) At the second hearing, she reported that she was sleeping in a recliner and her sleep was "horrible." (R. 61–62.) She testified that she could not sleep for more than two hours because of rheumatoid arthritis, dreams, anxiety, insomnia, and nerves. (R. 56, 62.) When she wakes up, she takes five minutes to get "kind of upright" and two hours to walk to the kitchen or bathroom. (R. 62.)

Vest receives a range of treatment for her conditions, including several medications. At the second hearing, she testified that she received most of her medication, including methadone, from Dr. Gray. (R. 71, 77.) She also reported that she regularly sees Dr. Hogenmiller; he gives her trigger point injections, but does not prescribe other medications because Vest wants to get as much of her medication as possible from one doctor. (R. 69–70, 78; *see also* R. 138–39.)

At the first hearing, Vest testified that she weighed 220 lbs. and that she had "never been this heavy in [her] whole life." (R. 140.) She reported gaining 75 lbs. in the last three or four years. (*Id.*) She indicated that she had been on a diet since June 2008 and that she tried to work out at a gym after a successful course of aquatic therapy but was physically unable to do so. (R. 139–41.) At the second hearing, Vest testified that she tries to get regular exercise, which typically consists of sitting on the edge of her chair and stretching out her arms. (R. 66–67.) She

Case 5:13-cv-00067-MFU-JCH   Document 22   Filed 07/17/14   Page 25 of 57   Pageid#: 1989

also testified that she joined a gym at her doctor's advice, but only used those machines her doctor indicated were appropriate. (R. 67.)

The ALJ questioned Vest at both hearings about her smoking habits. Vest testified at the first hearing that she smoked 10 cigarettes per day, was trying to quit due to her lung conditions, and used to smoke a pack a day, but never more. (R. 135–36.) At the second hearing, Vest testified that she stopped smoking on October 4, 2010, when she underwent mitral valve replacement surgery. (R. 73.) She also testified that, before stopping, she smoked "half a pack to a pack a day," but never more than that. (*Id.*)

Vest also testified about her mental impairments. At the first hearing, she testified that she had been seeing Dr. McKeegan twice a week for about a year for depression and anxiety. (R. 137–38.) At the second hearing, she testified that her mental health conditions had gotten worse and that she was still seeing Dr. McKeegan up to three times per week for a total of an hour or two each week. (R. 55–56, 71.) She also reported seeing psychiatrist Dr. Julie Roebuck every month or so for 15–30 minutes, and that Dr. Roebuck prescribes her Wellbutrin and Xanax. (*Id.*) Vest reported suffering from crying spells, during which she "buries" herself in her living room because she does not want others to see her in that condition. (R. 66.)

## IV. Discussion

### A. *Mental Impairments*

Vest argues that the ALJ erred in giving little weight to the opinion of her treating psychologist in finding that she had no severe mental impairment. (Pl. Br. 11.)

An impairment may be found non-severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984). Mental disorders are evaluated according to the

"special technique" set forth in 20 C.F.R. § 416.920a. The special technique requires the ALJ to assess a claimant's limitations in "four broad functional areas…: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 416.920a(c)(3). The ALJ must rate the degree of the claimant's limitation in the first three functional areas on a five point scale (none, mild, moderate, marked, and extreme) and in the fourth functional area (episodes of decompensation) on a four-point scale (none, one or two, three, four or more). *Id.* § 416.920a(c)(4). If a claimant's limitations in the first three areas are "none" or "mild," and if the claimant has suffered no episodes of decompensation, the ALJ "will generally conclude that [the claimant's] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." *Id.* § 416.920a(d)(1). In applying this special technique, the ALJ must "consider all relevant and available clinical signs and laboratory findings, the effects of [the claimant's] symptoms, and how [the claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id.* § 416.920a(c)(1).

The ALJ concluded at step two that Vest did not have a severe mental impairment. (*See* R. 17–21.) The ALJ began by discussing Dr. McKeegan's letters and treatment notes and noting the GAF scores he assigned between April and December 2010. (R. 17–20.) Applying the special technique set out in the regulations, the ALJ found that Vest has mild limitation in activities of daily living because "she is independent in her personal care, is able to prepare simple meals for herself and her children, can do occasional household chores, and is able to drive." (R. 20.) Next, he found mild limitation in social functioning because Vest "is able to visit with her friends and family, talk on the phone, go out to dinner occasionally with friends, go grocery shopping, and

Case 5:13-cv-00067-MFU-JCH   Document 22   Filed 07/17/14   Page 27 of 57   Pageid#: 1991

reports no problems getting along with other people." (*Id.*) He also found mild limitation in concentration, persistence, or pace based on Vest's ability "to pay bills, count change, handle a savings account, use a checkbook, and follow written instructions well" and the fact that "[s]he [was] noted on mental status examinations to have an intact memory. (*Id.*) Finally, he found no evidence of any episodes of decompensation of extended duration. (*Id.*) Because Vest demonstrated no more than mild limitation in the first three functional areas and no episodes of decompensation, the ALJ found her mental impairments non-severe. (*Id.*)

In reaching this conclusion, the ALJ gave "little weight" to Dr. McKeegan's opinions as expressed in his letters because "they are not supported by the longitudinal record with its generally routine and conservative treatment, including his own treatment notes." (R. 20–21.) He explained his reasoning as follows:

> The earliest note from Dr. McKeegan … was in June 2008, at which time, the claimant's mental status examination was completely within normal limits. Dr. McKeegan's follow-up notes are on brief handwritten 1-page forms. He did not start assigning GAF scores until April 2010, at which time the claimant's GAF was 77—indicating transient symptoms and no more than slight functional limitations. Thereafter, Dr. McKeegan assigned the claimant GAFs mostly in the 60s and 70s, with her most recent GAF of record in December 2010 being 67— indicating mild symptoms and functional limitations. Such GAF scores are not indicative of a severe, much less a disabling, impairment. The assessments prepared by Dr. McKeegan are more based [*sic*] the claimant's reported symptoms and limitations, rather than on objective findings and diagnostic test results. Moreover, the records from other treating sources do not reflect significant ongoing psychological signs on examinations.

(R. 21.)

The ALJ also noted Dr. Muller's testimony that Dr. McKeegan's notes "would not preclude the claimant form at least performing simple, routine, repetitive, low-stress (*i.e.*, non-production rate) work with minimal contact with the public," and that those limitations would

not prevent her from performing the jobs indicated by the vocational expert. (R. 21.) He did not, however, specify the weight he afforded to Dr. Muller's opinion.[3]

The ALJ's step two analysis turns on his wholesale rejection of Dr. McKeegan's opinion. An ALJ must consider and evaluate all opinions from "medically acceptable sources," such as licensed clinical psychologists, in the case record. 20 C.F.R. § 416.927; *see also* 20 C.F.R. § 416.913(a)(2) (designating licensed clinical psychologists as "medically acceptable sources"). In determining what weight to afford such an opinion, the ALJ must consider all relevant factors, including the relationship between the clinician and the patient, the degree to which the opinion is supported or contradicted by other evidence in the record, and the clinician's area of specialty. 20 C.F.R. § 416.927(c).

Opinions from acceptable medical sources who have treated the applicant generally are afforded more weight, because treating sources are "most able to provide a detailed longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence." 20 C.F.R. § 416.927(c)(2); *accord Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006). An ALJ must give a treating source opinion "controlling weight" to the extent that the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and … not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. § 416.927. Even when a treating source opinion is less than "well-supported" by diagnostic techniques, it is still entitled to some deference. *Tucker v. Astrue*, 897 F. Supp. 2d 448, 465 (S.D. W. Va. 2012) (citing Social Security Ruling 96-2p).

---

[3] In a footnote, the ALJ stated that "[t]o the extent Dr. Muller's testimony can be construed as suggesting that the claimant has or has had a severe mental impairment of 12-months duration, the undersigned disagrees for the previous stated reasons for not finding a severe mental impairment." (R. 36 n.13.)

29

However, an ALJ may reject a treating psychologist's opinion in whole or in part if there is "persuasive contrary evidence" in the record. *Hines*, 453 F.3d at 563 n.2; *Mastro*, 270 F.3d at 178; *Tucker*, 897 F. Supp. 2d at 465. The ALJ may give "significantly less weight" to a treating source's "conclusory opinion based on the applicant's subjective reports." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). The ALJ also may discount a treating source's conclusory opinion when it is inconsistent with the applicant's daily activities. *Dennison v. Astrue*, 5:10-cv-109, 2011 WL 2604847, at *2 (W.D. Va. Jul. 1, 2011) (citing *Craig*, 76 F.3d at 590). When an ALJ gives less than controlling weight to a treating source's opinion, the regulations require him to specify how much weight he gives the opinion and offer "good reasons" for that decision. 20 C.F.R. § 416.927(c)(2).

Not every statement from a doctor or psychologist regarding a patient's condition qualifies as a "medical opinion." "Medical opinions are statements from … acceptable medical sources that reflect judgments about the nature and severity of [the applicant's] impairment(s)," including: (1) the applicant's symptoms, diagnosis, and prognosis; (2) what the applicant can still do despite his or her impairment(s); and (3) the applicant's physical or mental restrictions. 20 C.F.R. § 416.927(a)(2). However, opinions on issues "reserved to the Commissioner," such as whether a person is disabled, are not considered "medical opinions" and are not entitled to any special weight under the regulations. 20 C.F.R. § 416.927(d)(1); *see also* SSR 96-5p, 1996 WL 374183 (Jul. 2, 1996); *Huff v. Astrue*, No. 6:09-cv-42, 2010 WL 5296842, at *5 (W.D. Va. Nov. 22, 2010). At the same time, statements from treating physicians and psychologists on issues reserved to the Commissioner are relevant, and often important, evidence. The ALJ must evaluate these statements in light of the whole record to determine the extent to which the

opinion is supported by the record, considering the same factors used to evaluate "medical opinions." SSR 96-5p, 1996 WL 374183 at *3; *see also* 20 C.F.R. § 416.927(c).

The ALJ's principal reason for rejecting Dr. McKeegan's opinion is that opinion's inconsistency with the GAF scores that Dr. McKeegan assigned to Vest between April and December 2010. GAF scores represent a "clinician's judgment of the individual's overall level of functioning." Am. Psyc. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) ("DSM-IV"). The scale is divided into 10 ten-point ranges reflecting different levels of functioning, with 1–10 being the lowest and 91–100 the highest. *Id.* The Diagnostic & Statistical Manual of Mental Disorders, Fifth Edition, ("DSM-V") dropped the GAF "for several reasons, including its lack of conceptual clarity (*i.e.*, including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013). Despite their shortcomings, GAF scores are fairly common in mental health treatment records.

Because they "reflect judgments about the nature and severity of [a claimant's] impairments," GAF scores assigned by "medically acceptable sources" constitute "medical opinions" under the regulations. 20 C.F.R. § 416.927(a)(2). But GAF scores may be of limited value in determining whether a claimant is disabled. A GAF score merely reflects a "snapshot of functioning at any given moment," *Powell v. Astrue*, 927 F. Supp. 2d 267, 273 (W.D.N.C. 2013), and may not be "indicative of [a claimant's] long term level of functioning," *Parker v. Astrue*, 664 F. Supp. 2d 544, 557 (D.S.C. 2009). Moreover, the GAF scale "has no direct medical or legal correlation to the severity requirements of social security regulations." *Powell*, 927 F. Supp. 2d at 273; *see also Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50,746, 50,764–65 (Aug. 21, 2000).

Most of the GAF scores Dr. McKeegan assigned between April and December 2010 fell between 61 and 80, indicating only "mild" or "slight" symptoms or impairments. *See DSM-IV* 34. Certainly, these scores suggest that Vest's symptoms were not as severe as Dr. McKeegan described in his letters. An ALJ may afford less weight to an opinion based on inconsistencies between that opinion and the source's own treatment notes. *See* 20 C.F.R. § 416.927(c)(4).

Here, however, the ALJ placed too much emphasis on GAF scores while disregarding other important evidence. Dr. McKeegan saw Vest at least weekly for over two years. (*See generally* R. 1426–1534, 1621–91.) His treatment notes, which the ALJ dismissed as "brief handwritten 1-page forms," document symptoms (Vest's subjective statements) and signs (Dr. McKeegan's observations and evaluations) consistent with severe mental illness. (*Id.*) Treatment notes through early 2010 consistently note "depressed" or "anxious" affect and also often indicate low energy, anhedonia, concentration problems, or depressed sleep, appetite, or libido. (*Id.*) Treatment notes from later in 2010 document labile, constricted, or irritable affect; pressured speech; tearful behavior; and problems staying on topic; as well as complaints of memory and concentration problems; sleep disturbances; low energy, libido, motivation, and interest; and anhedonia. (R. 1426–57, 1621–37.) This evidence supports Dr. McKeegan's opinion, but the ALJ summarily dismissed it, instead limiting his substantive discussion of Dr. McKeegan's treatment notes to GAF scores.[4]

_____

[4] Other courts have upheld ALJ decisions relying on GAF scores in the 61–70 range to find a claimant's mental impairments nonsevere. *See, e.g.*, *Walker v. Colvin*, Civ. No. CBD-11-2617, 2014 WL 292404, at *7 (D. Md. Jan. 24, 2014) (citing *Johnson v. Astrue*, No. TMD-10-947, 2011 WL 5149574, at *2 (D. Md. Oct. 17, 2011)); *Shrewsbury v. Astrue*, Civ. No. 1:08-00840, 2009 WL 3160357, at *7 (S.D. W. Va. Sep. 30, 2009); *Angus v. Comm'r of Soc. Sec.*, No. 2:07-cv-66, 2008 WL 2850343, at *15–21 (N.D. W. Va. Jul. 23, 2008). But none of these decisions supports the proposition that an ALJ may disregard the balance of the treatment notes and find a claimant's mental impairments nonsevere based solely on GAF scores. For example, in *Johnson*,

The ALJ's other reasons for discounting Dr. McKeegan's opinion only undermine his analysis. In the context of step-two analysis, his characterization of Dr. McKeegan's treatment as "routine and conservative" is inaccurate. Dr. McKeegan is a licensed clinical psychologist, not a physician, and as such he cannot engage in the practice of medicine (*e.g.*, by prescribing medications). *See* Va. Code §§ 54.1-3602 (providing that psychologists cannot administer or prescribe drugs or "in any way" engage in the practice of medicine), 54.1-2902 (prohibiting the unlicensed practice of medicine). Dr. Gray treated Vest with a host of psychotropic medications, including Klonopin, Xanax, Cymbalta, Prozac, Pristiq, Wellbutrin, Lexapro, Trileptal, Trazodone, Topamax, Neurontin, and Remeron.[5] (*See, e.g.*, R. 474–76, 479, 484, 675, 681, 785, 1538, 1541–44, 1737, 1742, 1770.) Viewed as a whole, Vest's course of mental health treatment suggests that her mental impairments are sufficiently severe to clear the Commissioner's minimal step-two threshold. *See Lawson v. Astrue*, No. 7:06-cv-747, 2007 WL 4268913, at *5 (W.D. Va. Nov. 30, 2007) (Urbanski, J.) (finding substantial evidence did not support ALJ's severity finding where applicant had a "documented history" of anxiety and had been treated with medication "over a period of years"); *cf. Johnson v. Colvin*, No. ED CV 13-1476-JSL(E), 2014 WL 2586886, at *8 (C.D. Cal. Jun. 7, 2014) (finding that an ALJ erred in characterizing as "conservative" claimant's treatment with psychotropic medications, and collecting cases).

---

the ALJ noted not only the consultative examiner's GAF score, but also specific evidence in the examiner's report that tended to show that the claimant's mental impairments were nonsevere. 2011 WL 5149574, at *2–3. And in *Angus*, the ALJ noted not only the treating psychiatrist's GAF score of 65, but also other remarks in the psychiatrist's notes, which showed that the claimant's medication was "helpful," that he was "responding fairly well to his treatment," and that he advised the claimant "about a possible reduction in the frequency of visits." 2008 WL 2850343, at *16.

[5] Some of these drugs were prescribed for Vest's other conditions, such as fibromyalgia.

Moreover, and contrary to the ALJ's decision (*see* R. 21 ( "[T]he records from other treating sources do not reflect significant ongoing psychological signs on examination.")), records from other treating sources document significant psychological signs and symptoms consistent with a severe mental impairment. Dr. Gray had diagnosed depression as far back as 2002. (R. 645.) Vest regularly reported to Dr. Gray that she was suffering symptoms of mental illness, and Dr. Gray's own observations tend to corroborate her complaints. At two visits in 2005, he noted that Vest appeared depressed, and in December 2006, he noted that she was "distraught." (R. 485–86.) On at least four visits between November 2009 and April 2011, he noted that Vest was "tearful." (1541–44, 1736, 1756–57.) And in June 2010, Dr. Gray noted that Vest was "chronically depressed appearing and on the verge of tears at times." (R. 1761.)

Even doctors who had no role in Vest's mental health treatment noted signs of mental impairment. Dr. Hogenmiller noted on one occasion that she was "tearful." (R. 1571–73, 1599–1601.) Dr. John H. Yang, a cardiologist, noted that she showed a "highly anxious affect." (R. 1727.) Dr. Haris Turalic, another cardiologist, noted "significant anxiety" on physical exam. (R. 968.) Vest's nephrologist and pulmonologist noted "mildly," "slightly," or "somewhat" depressed or anxious mood on several occasions. (R. 627, 865, 868, 875, 886.) And physicians who treated Vest at Augusta Medical Center during the relevant period noted that Vest appeared anxious or depressed. (R. 777 ("tearful" with "depressed affect"), 981 ("markedly anxious affect"), 983 ("She is anxious."), 1098 ("appears very anxious and shaky"), 1702 ("anxious").)[6]

---

[6] Granted, Vest's other treating providers often do not indicate any signs or even symptoms of mental disorder, but they were not tasked with treating her mental conditions. Moreover, Vest's most recent mental diagnoses—major depressive disorder recurrent and bipolar II disorder—are characterized by episodic, rather than persistent depression. *See DSM-IV* 376, 397.

34

The ALJ regarded Dr. McKeegan's assessments as "more based on the claimant's reported symptoms and limitations, rather than on objective findings and diagnostic test results." (R. 21.) It's true, as the ALJ noted, that Dr. McKeegan did not perform any diagnostic "tests." It is also true that Dr. McKeegan's assessment relied in part on Vest's subjective reports of her symptoms. But Dr. McKeegan also documented objective signs of mental illness and relied on those signs, too, in reaching his conclusions.

Ostensibly in support of his nonseverity finding, the ALJ noted Dr. Muller's testimony that Dr. McKeegan's opinions "would not preclude [Vest] from at least performing simple, routine, repetitive, low-stress (i.e. non-production rate) work with minimal contact with the public." (R. 21.) But Dr. Muller's testimony does not support the ALJ's conclusion. Dr. Muller essentially agreed with some of the limitations indicated by Dr. McKeegan and stuck with his assessment despite the ALJ's attempts to elicit testimony that Vest's mental impairments were nonsevere. (*See* R. 107.) These restrictions impose more than a minimal limitation on Vest's ability to work and thus indicate that her mental impairments were severe.

Both the ALJ in his decision and the Commissioner in her brief point to the DDS psychologists' assessments as supporting the ALJ's conclusion that Vest had no severe mental impairment. (R. 21 n.6; Pl. Br. 20.) But, as the Appeals Council noted in vacating the ALJ's first decision, the DDS physicians and psychologists rendered these opinions "more than two years before the date of the [first] hearing" and "without benefit of much of the evidence now in the record." (R. 174–75.) Notably, the DDS psychologists did not have access to any of Dr.

McKeegan's treatment notes. These evaluations therefore provide no basis to completely discount Dr. McKeegan's opinion as the ALJ did in this case.[7]

Aside from the GAF scores, the record does not support the ALJ's rationale for giving little weight to Dr. McKeegan's opinion. Thus, the ALJ's rejection of Dr. McKeegan's opinion—and, by extension, his nonseverity finding—rests entirely on the 26 GAF scores Dr. McKeegan assigned between April 2010 and December 2010. But the GAF scores simply cannot bear the weight that the ALJ places on them. The other findings in Dr. McKeegan's treatment notes, the findings in notes of Vest's other treating health care providers, Vest's course of treatment with numerous psychotropic medications and weekly counseling, and the opinion of Dr. Muller—who the agency itself hired to testify at the second hearing—all suggest that Vest is more than "mildly" limited in at least two of the first three functional areas (if not all three) and thus has a severe mental impairment. Accordingly, I cannot find that substantial evidence supports the ALJ's determination that Vest's mental impairment is non-severe.

When an ALJ has found at least one severe impairment, any failure to find another impairment severe is harmless so long as the ALJ considers all of the claimant's impairments in assessing how much work a claimant can still do. *Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013); *Delia v. Comm'r of Soc. Sec.*, 433 F. App'x 885, 887 (11th Cir. 2011); *Carpenter v. Astrue*, 537 F.3d 1264, 1265–66 (10th Cir. 2008); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); *Powell v. Astrue*, 927 F. Supp. 2d 267, 274–75 (W.D.N.C. 2013). But the ALJ compounded his step two error in his RFC assessment, when, in rejecting the limitations

_____

[7] I do not find here that the ALJ must accept the entirety of Dr. McKeegan's letters as fact or give all of the opinions expressed in those letters controlling weight.

36

identified by Dr. Muller (specifically, limitation to simple, repetitive tasks and minimal contact with the public), he merely referred back to his deficient step two analysis. (*See* R. 36 n.13.)

The Commissioner argues that the ALJ's step two error is harmless for a different reason. Specifically, the Commissioner argues that even if the ALJ adopted Dr. McKeegan's opinion, substantial evidence supported the conclusion Vest could still perform work existing in significant numbers in the national economy. (Def. Br. 21.) The ALJ noted the VE's testimony that an individual limited to simple, routine, repetitive, low-stress work with minimal contact with the public, along with the other limitations included in the ALJ's RFC, could still perform work as a surveillance monitor, for which there are 2,000 positions in Virginia and 80,000 positions nationally. (R. 40.) However, even if substantial evidence supports the ALJ's alternative step-five finding, remand is still required because the ALJ also erred at step three.

## B. Listing

Vest argues that the ALJ erred in failing to consider her fibromyalgia in evaluating whether she met or equaled a listed impairment. (Pl. Br. 3.) She notes that the ALJ's step three analysis fails to mention fibromyalgia. (*Id.*) She asserts that the ALJ might have relied on Dr. Alexander's testimony that fibromyalgia is not a condition for which an equivalency determination can be made. (*Id.*; *see also* R. 93–94.) Vest argues that this violated Social Security Ruling ("SSR") 12-2p, "which requires an evaluation of equivalency" in fibromyalgia cases. (*Id.*) Vest contends that her fibromyalgia equals Listings 1.02 (major joint dysfunction), 1.04 (disorders of the spine), 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 14.09(D) (inflammatory arthritis). (*Id.* at 6.)

At the third step of the Commissioner's decisional process, the ALJ must evaluate the claimant's impairments against the Listings. 20 C.F.R. § 416.920(a)(4)(iii). "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience,

from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990); 20 C.F.R. § 416.925(a). They "streamline[] the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987). The claimant bears the burden of demonstrating that her impairment meets or equals a medical listing. *Id.* at 146 n.5. A claimant who meets or equals a listing is "conclusively presumed to be disabled." *Id.* at 141.

An impairment meets a listed impairment if it "satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the [one-year] duration requirement." 20 C.F.R. § 416.925(c)(3). An impairment or combination of impairments "is medically equivalent to a listed impairment … if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). In determining whether a claimant's impairments are of listing-level severity, an ALJ must "consider the combined effect of all of the [claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 42 U.S.C. § 423(d)(2)(B).

In this case, the ALJ found that Vest "does not have an impairment or combination of impairments that meets or medically equals the severity of" a listed impairment. (R. 21.) The ALJ first noted the opinions of Dr. Muller, Dr. Alexander, and the state Disability Determination Services physicians and psychologists that Vest did not have a listing-level impairment. (R. 21.) The ALJ began his own analysis by noting that Vest's obesity did not fall within a specific listing, but that even considering "the cumulative effects of obesity," the "evidence still fails to meet the requirements of any listed impairments." (R. 22.) The ALJ specifically considered whether Vest's "degenerative disc disease with obesity" met or equaled Listing 1.04; whether her

"COPD with obesity" met or equaled Listing 3.02; whether her "venous insufficiency with obesity" met or equaled Listing 4.11; and whether her "history of rheumatoid arthritis with obesity" met or equaled Listing 14.09. (*Id.*) In each case, the ALJ found that Vest's impairments did not meet or equal the relevant listing. (*Id.*) In particular, the ALJ explained that he rejected Listing 14.09(D) because "there is no evidence of … repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at a marked level: limitation of activities of daily living, limitation in maintaining social functioning, or limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace." (R. 22–23.)

Social Security Ruling 12-2p explains how the Commissioner considers fibromyalgia at each step of the five-step sequential evaluation process. 2012 WL 3104869 (Jul. 25, 2012). SSR 12-2p explains that fibromyalgia "cannot meet a listing … because [it] is not a listed impairment." *Id.* at *6. Thus, at step three, the Commissioner must "determine whether [fibromyalgia] medically equals a listing (for example, listing 14.00(D) in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment." *Id.*

Vest and the Commissioner disagree over whether SSR 12-2p is applicable to this case because it became effective on July 25, 2012, after the ALJ issued his decision. (Pl. Br. 3; Def. Br. 14.) But SSR 12-2p's instruction that ALJs must consider medical equivalency in fibromyalgia cases simply applies the clear provisions of the regulations to a common fact pattern in social security cases. *See* 20 C.F.R. § 416.926. Social security rulings addressing other impairments not covered under a listing also echo the regulations' requirement that an ALJ consider whether particular impairments, alone or in combination with other impairments, meet

or medically equal a listed impairment. *See, e.g.*, SSR 99-2p, 1999 WL 271569, at *4–5 (chronic fatigue syndrome); SSR 02-1p, 2002 WL 34686281, at *5–6 (obesity); SSR 02-2p, 2002 WL 32063779, at *5 (interstitial cystitis); SSR 14-2p, 2014 WL 2472008, at *6 (diabetes mellitus); SSR 14-3p, 2014 WL 2472009, at *7 (endocrine disorders other than diabetes mellitus). Thus, the ALJ was required under the Commissioner's regulations to consider whether Vest's fibromyalgia, in combination with her other impairments, equaled a listing.

The ALJ's opinion suggests that he failed to consider fibromyalgia at step three. He does not mention fibromyalgia once in his step-three analysis. (R. 21–23.) The ALJ cited Dr. Alexander's opinion that Vest's physical impairments did not meet or equal a listing, but Dr. Alexander did not consider whether Vest's fibromyalgia equaled a listing because he did not "think there is a[n] … appropriate listing to use as an equals" for fibromyalgia. (R. 21, 93.) Neither in his rationale or his findings did the ALJ expressly consider Vest's fibromyalgia, alone or in combination with her other impairments, in determining whether or not she equaled a listing. The ALJ's failure to do so was error.

The Commissioner argues that this omission does not matter, because Vest cannot "meet her burden of demonstrating the presence of medical findings equal in severity to *all* of the criteria of a listed impairment." (Def. Br. 14.) In other words, the Commissioner argues that the ALJ's error in this case was harmless. "Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error." *Kersey v. Astrue*, 614 F. Supp. 2d 679, 696 (W.D. Va. 2009). For example, if an ALJ errs in analyzing an issue, but no reasonable ALJ following the correct analysis could have reached a different conclusion, then the error is harmless. *Maloney v. Comm'r*, 480 F. App'x. 804, 810 (6th

Cir. 2012); *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006); *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004).

An error at one step of process may also be rendered harmless by an ALJ's findings of fact at other steps. In *Fischer-Ross v. Barnhart*, 431 F.3d 729 (10th Cir. 2005), the Tenth Circuit held that "an ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment." *Id.* at 733. The Fourth Circuit and the presiding district judge in this case have both cited *Fischer-Ross* approvingly. *See, e.g.*, *Smith v. Astrue*, 457 F. App'x 326, 328 (4th Cir. 2011); *Robinson v. Colvin*, No. 7:12-cv-272, 2014 WL 1276507, at *4 & n. 6 (W.D. Va. Mar. 26, 2014) (Urbanski, J.) (also citing *Smith*); *Vest v. Astrue*, No. 5:11-cv-047, 2012 WL 4503180, at *3 (W.D. Va. Sep. 28, 2012) (Urbanski, J.) (same).

In conducting harmless error analysis, the Court must be careful to respect Congress's delegation of fact-finding authority to the Commissioner. Reviewing courts may not "take the place of [the] agency" in finding facts or "advancing a rationale for agency action." *Eggers v. Clinchfield Coal Co.*, 29 F. App'x 144, 149 (4th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943)). The mere fact that an ALJ properly found a claimant capable of past work at step four or of other work at step five does not render an error at step three harmless; otherwise, step three errors would never be reversible alone, which is clearly not the case. *See, e.g.*, *Carpenter v. Astrue*, 537 F.3d 1264, 1266–70 (10th Cir. 2008) (applying *Fischer-Ross* to find reversible error in an ALJ's failure to explain his conclusion that the claimant did not meet or equal mental health listings). Rather, the Court must consider whether an ALJ's specific and adequately supported findings of fact at other steps of the process conclusively preclude a finding that the claimant met the listing in question. *See, e.g.*, *Fischer-Ross*, 431 F.3d at 734

Case 5:13-cv-00067-MFU-JCH   Document 22   Filed 07/17/14   Page 41 of 57   Pageid#: 2005

(ALJ's findings that claimant could not perform "repetitive alternating motions with her hands," but could lift 20 lbs. maximum and 10 lbs. repeatedly and grip over 20 lbs. in each hand precluded listing requiring "persistent disorganization of motor function in two extremities"); *Vest*, 2012 WL 4503180, at *3–4 (ALJ finding in RFC assessment that claimant's impairments do not "significantly affect claimant's ability with ambulation, mobility, or manipulation" precluded listing requiring "inability to ambulate … or perform fine and gross movements … effectively").

I agree with the Commissioner that there is no evidence that Vest meets or equals Listing 1.02, which requires "major dysfunction of a joint," or Listing 1.04, which requires a spinal disorder significantly more severe than this record supports. But the other listings that Vest points to cannot be so easily dismissed. Listings 12.04 and 14.09(D) each contain separate medical and functional criteria. The claimant must satisfy both the medical criteria and functional criteria for a given listing to be found disabled under that listing. Listing 12.04 (affective disorders) requires certain clinical findings (paragraph A)[8] and either marked[9] limitation in two of three areas of functioning (activities of daily living, maintaining social

---

[8] Paragraph A requires either (1) depressive syndrome with at least four of the following symptoms: anhedonia; appetite disturbance; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; or hallucinations, delusions, or paranoid thinking; (2) manic syndrome with at least three of the following symptoms: hyperactivity; pressure of speech; flight of ideas; inflated self-esteem; decreased need for sleep; easy distractibility; risky behavior; or hallucinations, delusions, or paranoid thinking; or (3) bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of manic and depressive syndromes.

[9] The regulations define "marked" as more than moderate but less than extreme, but do not define either "moderate" or "extreme." Listings § 12.00(C). The Listings explain that "[a] marked limitation may arise when … the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." *Id.*

Case 5:13-cv-00067-MFU-JCH   Document 22   Filed 07/17/14   Page 42 of 57   Pageid#: 2006

functioning, and concentration, persistence, or pace) or marked limitation in one area of functioning plus repeated episodes of decompensation, each of extended duration (paragraph B).[10] Listing 14.09(D) (inflammatory arthritis) requires "[r]epeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)" and marked limitation in one area of functioning.

A reasonable ALJ could conclude that Vest satisfies the medical criteria for either listing. Dr. McKeegan's notes document persistent depressive syndrome characterized by anhedonia or loss of interest (*see, e.g.*, R. 1426–27, 1429, 1432, 1436, 1445–48, 1451–52, 1454, 1547), sleep disturbance (*see, e.g.*, R. 1427, 1429, 1436, 1439, 1444, 1446, 1448, 1450–52, 1454), decreased energy (*see, e.g.*, R. 1426–27, 1429, 1432, 1436–37, 1444–48, 1450–54, 1457), feelings of guilt or worthlessness (*see, e.g.*, R. 1430–33, 1436–37, 1439, 1441, 1445–46, 1448, 1450, 1454, 1456 (noting tendency for self-blame or self-esteem problems)), and difficulty concentrating or thinking (*see, e.g.*, R. 1432, 1446, 1449–50, 1454, 1457–1460, 1463–64, 1466). *See* Listings § 12.04(A)(1). Moreover, particularly after April 2010, Dr. McKeegan consistently diagnosed either "major depressive disorder recurrent" or "bipolar disorder depressed," and the criteria for these diagnoses track the requirements of subparagraphs A1 and A3.[11] Medical records contain ample evidence of one of the four constitutional symptoms set out in listing 14.09(D)—severe

---

[10] Listing 12.04 can also be met or equaled if the claimant satisfies the paragraph A criteria and alternative functional criteria in paragraph C, but the evidence here does not support a finding that Vest has satisfied the paragraph C criteria.

[11] *See DSM-IV* 356 (symptomatic criteria for major depressive episode, which mostly parallel those for depressive syndrome in paragraph A1); *id.* at 362, 368 (symptomatic criteria for manic and hypomanic episode, which mostly parallel those for manic syndrome in paragraph A2); *id.* at 376 (criteria for major depressive disorder, recurrent; principally requires two or more major depressive episodes); *id.* at 397 (criteria for bipolar II disorder; requires at least one major depressive and one hypomanic episode).

43

fatigue—and at least arguable evidence of malaise.[12] None of the findings in the ALJ's decision preclude a determination that Vest satisfies the medical criteria for Listings 12.04 or 14.09(D).

A reasonable ALJ could also have found that Vest satisfies the paragraph B criteria of Listing 12.04 or the functional criteria in Listing 14.09(D). In particular, a reasonable ALJ could conclude that Vest has marked limitations in concentration, persistence, or pace and social functioning.

"Concentration, persistence or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." Listings § 12.00(C)(3); *see also* Listings § 14.00(I)(8). Concentration, persistence, and pace may be evaluated based on observations in work settings, limitations in other settings, clinical examinations, or psychological testing. Listings § 12.00(C)(3). An ALJ must "exercise great care in reaching conclusions about" a claimant's concentration, persistence, or pace based on "a time limited mental status examination" or the claimant's "ability to complete tasks in [less-demanding] settings." *Id.* The ALJ's evaluation must consider "all the evidence, with an emphasis on how independently, appropriately, and effectively [the claimant is] able to complete tasks on a sustained basis." *Id.* Although Vest indicated that she can handle money and follow written instructions, she also indicated that she has difficulty following verbal instructions. (R. 370, 372.) She showed intact memory and cognitive function at a mental status examination on June 4, 2008 (R. 1534), but Dr. McKeegan's treatment notes for many of Vest's later visits indicate concentration deficits. Dr. McKeegan also noted on some visits that Vest had problems staying on topic or showed

---

[12] "Malaise means frequent feelings of illness, discomfort, or lack of well-being that result in significantly reduced physical activity or mental function." Listings § 14.00(C)(2).

tangential or circumstantial thought processes. (R. 1429, 1441, 1443, 1451–52, 1455–56.) Vest testified that she often suffered from "fibromyalgia fog," and medical records indicate that Vest had a confusion spell at a drug store in September 2010. (R. 1752.) Finally, Dr. Muller testified that Vest's mental impairments alone would restrict her to simple, repetitive tasks, a restriction that does not rule out a finding of marked limitation in concentration, persistence, or pace. *See* Listings § 12.00(C)(3) (noting that the ability to perform simple tasks is not necessarily inconsistent with marked limitation in concentration, persistence, or pace); *Stokes v. Astrue*, 274 F. App'x 675, 680–81 (10th Cir. 2008) (concluding that a reasonable ALJ could find marked limitations where a consulting examiner had found marked and moderate limitations and the ALJ had limited the claimant to "simple, repetitive, and routine work").

"Social functioning refers to [the] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals," and includes "the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." Listings § 12.00(C)(2). "[A] history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation" suggests impaired social functioning, while "ability to initiate social contacts [and] communicate clearly with others or interact and actively participate in group activities" may demonstrate strength in social functioning. *Id.* In considering whether an individual is markedly limited in social functioning, the ALJ must consider "the nature and overall degree of interference with function" rather than "a specific number of behaviors in which social functioning is impaired." *Id.* Dr. McKeegan's treatment notes document frequent conflicts with family members (R. 1426–27, 1429, 1436, 1445–47, 1455–57, 1482–83, 1487), and his letters indicate that "although [Vest] has very good superficial social skills" and could "initially … 'get along with others,'" she could become

45

"irritable and problematic with her co-workers" if any difficulty ever arose. (R. 717.) The listings emphasize that the ALJ must consider the level of functioning a claimant demonstrates on a *sustained* basis. *See* Listings § 12.00(C). Moreover, Dr. Muller testified that Vest would not be able to tolerate more than minimal contact with the general public. (R. 106–07.) Although this evidence is not nearly as strong as the evidence of limitation in the area of concentration, persistence, or pace, it is enough that an ALJ could plausibly find that Vest's physical and mental impairments, considered together, cause marked limitations in social functioning.

The ALJ's "confirmed or unchallenged" findings at other steps of the process do not conclusively preclude a conclusion that Vest has marked limitations in these two functional areas. *Cf. Fischer-Ross*, 431 F.3d at 734. The ALJ did find at step two that Vest had only mild limitations in the three functional areas in finding her mental impairments non-severe alone or in combination. (R. 20.) But, as noted above, the ALJ's step two finding was not supported by substantial evidence. Moreover, it is far from clear that the ALJ considered the effect of Vest's fibromyalgia—or for that matter any of her other physical impairments—in making these findings. Thus, the ALJ's step two findings do not cure his step three error.

Nor does the ALJ's RFC assessment render his step three error harmless. It is true that the ALJ found Vest's statements "not entirely credible as they relate to the intensity, persistence, and limiting effects" of her symptoms. (R. 25.) However, in assessing Vest's credibility, the ALJ did not have to consider "the *degree* to which" Vest functions socially or maintains concentration, persistence, or pace, "which [are] essential concern[s] at step three in this case." *Carpenter*, 537 F.3d at 1270.

In his RFC assessment, the ALJ declined to limit Vest to simple, repetitive tasks and minimal contact with the public. (R. 36.) The ALJ recognized that his refusal to limit Vest to

simple, repetitive tasks in a low-stress environment was inconsistent with the opinions of both Dr. McKeegan and Dr. Muller. In a footnote at the end of the paragraph in his RFC assessment discussing Vest's mental impairments and Dr. McKeegan and Dr. Muller's opinions, the ALJ noted, "To the extent that Dr. Muller's testimony can be construed as suggesting that the claimant has or has had a severe mental impairment of 12-months duration, the undersigned disagrees for the previous stated reasons for not finding a mental impairment." (R. 36 n.13.) However the ALJ's step two findings were not supported by substantial evidence and as such cannot support a finding that his error at step three is harmless.

Because a reasonable administrative fact-finder could conclude that Vest meets or equals listings 12.04 or 14.09(D), and because the ALJ's confirmed and unchallenged findings at other steps of the five-step process do not provide a basis for affirming the ALJ's deficient step-three analysis, the ALJ's error in failing to consider the effects of Vest's fibromyalgia at step three was not harmless. Thus, I find that the ALJ's listing analysis as to Vest's severe impairment of fibromyalgia is not supported by substantial evidence and remand is necessary.

*C.  RFC Assessment*[13]

Vest argues that the ALJ disregarded her fibromyalgia and failed to consider her subjective symptoms in assessing her residual functional capacity. (Pl. Br. 7–10.) Specifically, she contends that the ALJ violated Social Security Ruling ("SSR") 12-2p by failing to consider fibromyalgia in assessing her RFC, improperly cherry-picked inconsistencies in her statements in finding her not credible, and improperly rejected the opinions of her treating physicians. (*Id.*)

---

[13] Having determined that remand is necessary to address the ALJ's error at step three, I nonetheless will address Vest's additional argument for the sake of providing a Report and Recommendation that addresses all of the issues raised to the presiding district judge.

1. *Pain Standard & Vest's Credibility*

In evaluating a claimant's subjective symptoms, including pain, an ALJ must follow a two-step process. *Craig*, 76 F.3d at 594; 20 C.F.R. § 416.929. First, the ALJ must determine whether objective medical evidence shows "'the existence of a medical impairment which results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged.'" *Craig*, 76 F.3d at 594 (quoting 20 C.F.R. § 416.929(b)). To clear this threshold, the claimant must show "by objective evidence of the existence of a medical impairment 'which could reasonably be expected to produce' the actual pain [or other symptom], in the amount and degree, alleged by the claimant." *Id.*; *see also* 42 U.S.C. §§ 423(d)(5)(A) ("[T]here must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment … which could reasonably be expected to produce the pain or other symptoms alleged…."), 1382c(a)(3)(H)(i) (making § 423(d)(5) applicable to SSI proceedings).

If the claimant has made this showing, the ALJ must evaluate the intensity and persistence of a claimant's pain and other subjective symptoms, taking into account the claimant's statements along with "the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain…; and any other evidence relevant to the severity of the impairment, such as the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it." *Craig*, 76 F.3d at 594; 20 C.F.R. § 416.929(c). At this step, the ALJ may not dismiss a claimant's testimony about the intensity and persistence of those symptoms "solely because the available objective medical evidence does not substantiate" those statements. 20 C.F.R. § 416.929(c)(2); *Hines v. Barnhart*, 453 F.3d 559, 563–64 (4th Cir. 2006); *Craig*, 76 F.3d at 595. Thus, on the second step, subjective evidence alone may suffice to establish that pain or other symptoms are disabling. *Hines*, 564 F.3d at 564–

48

65. However, a claimant's "symptoms, including pain, will be determined to diminish [his or her] capacity for basic work activities … to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(c)(4).

Provided he stays within these bounds, "[i]t is the province of the ALJ to assess the credibility of … a claimant." *Ratliff v. Barnhart*, 580 F. Supp. 2d 504, 517 (W.D. Va. 2006). The ALJ must articulate "specific reasons for the [credibility finding]," and these reasons must be "supported by the evidence in the case record." SSR 96-7p, 1996 WL 374186, at *2. The ALJ's reasons "must be sufficiently specific to make clear" to the claimant and the reviewing court how the ALJ weighed the statements and why. *Id.* at *4; *Dunn v. Colvin*, 973 F. Supp. 2d 630, 640–41 (W.D. Va. 2013). So long as the ALJ has followed the regulations, reviewing courts must defer to the ALJ's reasonable credibility determination. *See Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (citing *Craig*, 76 F.3d at 589); *see also Dunn v. Colvin*, 973 F. Supp. 2d at 640 ("[T]he question for the Court is whether the ALJ applied the proper legal standard in assessing Plaintiff's credibility, and whether the ALJ's decision is supported by substantial evidence.").

SSR 12-2p explains how the Commissioner applies the pain standard in fibromyalgia cases. SSR 12-2p states that "Fibromyalgia which [the agency] determined [at step 2] to be [a medically determinable impairment ("MDI")] satisfies the first step of [the] two-step process for evaluating symptoms." *Id.* at *5. "Once an MDI is established," the agency

> "evaluate[s] the intensity and persistence of the person's pain and other symptoms and determine[s] the extent to which the symptoms limit the person's capacity for work. If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, [the agency] consider[s] all of the evidence in the case record, including the person's daily activities, medications or other treatments the person

49

uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms. [The agency] will make a finding about the credibility of the person's statements regarding the effects of his or her symptoms on functioning."

*Id.*

Here, the ALJ found that Vest's "medically determinable impairments could reasonably be expected to produce some of the symptoms and limitations of general type" she alleged, but that her statements were "not entirely credible as they relate to the intensity, persistence and limiting effects of those symptoms in light of the longitudinal record as a whole and that any assessment that fully credits the [her testimony] will likely overstate the degree of [her] limitations."[14] (R. 25.)

The ALJ found Vest not credible for several reasons. First, he noted that evidence in treatment records—specifically, the absence of objective findings, Vest's "history of prescription drug abuse," and her "routine and conservative" treatment—"does not support her allegations regarding the severity of her limitations." (R. 37.) Second, the ALJ noted that Vest's ongoing activities are not indicative of someone who is unable to work. (R. 37 & n.16.) Finally, the ALJ noted that inconsistencies in Vest's testimony and between her testimony and medical records undermined her credibility. (R. 37.)

The ALJ appropriately evaluated Vest's statements about the severity of her pain against Vest's treatment notes, including the absence of objective findings supporting severe pain.

---

[14] The ALJ's step one finding is incomplete, as his finding that Vest's medically determinable impairments could be expected to produce "*some* of the symptoms and limitations *of the general type*" she alleged (R. 25 (emphasis added)), does not answer whether her impairments "'could reasonably be expected to produce' the actual pain, in the amount and degree, alleged by [Vest]." *Craig*, 76 F.3d at 594. The ALJ's subsequent credibility analysis renders this error harmless. *See Smith v. Astrue*, No. 3:09-cv-488, 2011 WL 1303637, at *3–6 (W.D.N.C. Mar. 31, 2011) (finding that *Craig* did not require remand based on alleged errors at step one, where ALJ found that claimant's impairment could cause some, but not all, of pain alleged).

Although absence of objective findings says little about the severity of a patient's fibromyalgia pain, *see Ellis v. Colvin*, 5:13-cv-43, 2014 WL 2862703, at *8 (W.D. Va. Jun. 24, 2014), Vest's complaints were not limited to fibromyalgia, but included degenerative arthritis of the spine, osteoarthritis, rheumatoid arthritis, and a number of other conditions. (Pl. Br. 1.) Thus, the ALJ properly noted a lack of objective support in imagery and other testing for disabling pain from these conditions.

Likewise, the ALJ properly considered the conservative nature of Vest's treatment. An ALJ may consider a claimant's course of treatment in evaluating the claimant's credibility. 20 C.F.R. § 416.929(c)(3). As the ALJ noted, Vest's only surgery during the relevant period was unrelated to her musculoskeletal pain complaints, and she has not received ongoing treatment from a pain management specialist. (R. 37.) It is true that the appropriate treatment for fibromyalgia, which is a significant cause of Vest's pain, is usually conservative. *See Ellis*, 2014 WL 2862703, at *9. However, even in fibromyalgia cases, a conservative course of treatment may, "when considered with other information, … indicate that a condition is not as severe as a plaintiff's subjective complaints may otherwise indicate." *Viverette v. Astrue*, No. 5:07-cv-395-FL, 2008 WL 5087419, at *2 (E.D.N.C. Nov. 24, 2008).

The ALJ also properly relied on Vest's reports of her own activities in discounting her testimony. An ALJ may consider a claimant's daily activities in assessing the severity of a claimant's symptoms. 20 C.F.R. § 416.929(c)(3); *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986); *Keen v. Astrue*, No. 1:08-cv-00031, 2010 WL 308806, at *2 (W.D. Va. Jan. 28, 2012); *Weddle v. Barnhart*, No. 7:06-cv-00686, 2007 WL 2471442, at *5 (W.D. Va. Aug. 31, 2007). As the ALJ here pointed out, Vest repeatedly reported that she was able to exercise regularly. (R. 37 n.16, 466, 562, 678, 681, 683, 685, 785, 820–21, 1098, 1730.) Vest also

reported going on vacation, cooking, shopping, wrapping gifts, and being in a play. (R. 37 n. 16, 466, 680, 812, 1758.) Not only do these reports by themselves suggest that Vest may not be disabled, they also undermine the credibility of her conflicting testimony.

The ALJ also appropriately considered Vest's "history of prescription drug abuse" and "frequent[] requests [for] more pain medications form her doctors." (R. 37.) An ALJ may consider evidence of drug-seeking behavior in evaluating a claimant's credibility. *See Similia v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009); *Lewis v. Astrue*, 498 F.3d 909, 910 (9th Cir. 2007). Medical records show that Vest often took more narcotic medication than she was prescribed despite repeated instructions not to do so. (R. 641 (Vest given "one more chance" with narcotic pain medication contract after running out of methadone early); R. 643 (Vest ran out of methadone five days early; informed that future violations will not be tolerated); R. 650 ("She reports she's been having some increasing pain and is taking 6 methadone a day and has run out early."); R. 1759–60 (Vest took extra methadone and oxycodone and reported that her mother stole her Klonopin); R. 1756–57 (Vest took extra methadone and is short again); R. 1539, 1771 (Vest used extra pain meds; Dr. Gray refills early); *see also* R. 1530, 1770 ("[Vest] reports again that she has not been taking extra … but somehow she seems to run out a day or two early.").)

Finally, the ALJ also properly considered the inconsistencies in Vest's own statements regarding her smoking habits and inconsistencies between her statements about her weight and treatment records. Courts have long allowed parties to use a witness's prior inconsistent statements to impeach his or her testimony. *See, e.g.*, *United States v. Hale*, 422 U.S. 171, 176 (1975); *Baltimore & Ohio R.R. v. Rambo*, 59 F. 75, 83 (6th Cir. 1893); *Charlton v. Unis*, 45 Va. 58, 60 (1847); *see also* 3A John Henry Wigmore, *Evidence in Trials at Common Law* § 1017 (J. Chadbourn rev. 1970). There is no reason that Social Security ALJs may not likewise consider a

claimant's inconsistent statements in evaluating her credibility. *See, e.g.*, *Kearse v. Massanari*, 73 F. App'x 601, 603 (4th Cir. 2003) (finding that the ALJ properly considered a claimant's inconsistent statements in evaluating his credibility.); *Wake v. Comm'r of Soc. Sec.*, 461 F. App'x 608, 609 (9th Cir. 2011) ("The ALJ did not err by considering inconsistent statements about [the claimant's] drinking history when assessing her credibility.").

Vest testified at both hearings that she never smoked more than a pack of cigarettes per day, which is inconsistent with what she had told doctors in the recent past. (R. 37, 73, 136, 580, 626, 1035.) Vest's statement at the first hearing that she had gained 75 pounds in the past three or four years was an exaggeration. Vest testified at that hearing that she weighed 220 pounds (R. 140), and treatment records from around that time show that her weight ranged between 215 and 226 pounds, (*see, e.g.*, R. 140, 626–28, 810–12, 820–21, 1555–56, 1563–64), although her weight was recorded at 228 lbs at one office visit in June 2008. (R. 613.) The lowest recorded weight in the administrative record is 179 pounds on February 27, 2002—49 lbs. less than her maximum weight before the first hearing. (R. 646.) Measurements taken in 2005 and later years show that Vest's weight was over 200 lbs. (R. 37.) Thus, the ALJ reasonably concluded that Vest exaggerated the magnitude of her weight gain over the past three to four years and appropriately took this exaggeration into account in assessing her credibility.

Vest argues that the ALJ cherry-picked discrepancies in her testimony that bear little on the credibility of her subjective reports of symptoms. (Pl. Br. 9.) If Vest's statements about her smoking habits and weight gain were the ALJ's only grounds for discrediting her testimony, I might be inclined to agree. *Cf. Chen v. INS*, 266 F.3d 1094, 1098 (9th Cir. 2004) (noting, in the context of asylum determinations, that "[a]dverse credibility determinations based on minor discrepancies, inconsistencies, or omissions that do not go to the heart of [a case] cannot

constitute substantial evidence"), quoted approvingly in *Dankam v. Gonzalez*, 495 F.3d 113, 122 (4th Cir. 2007).[15] However, these inconsistent and inaccurate statements were just two of several reasons the ALJ cited in discounting Vest's testimony.

By evaluating the credibility of Vest's claims regarding the severity of her pain in light of the entire record, the ALJ performed the required step two pain standard analysis. The ALJ found that Vest's complaints of disabling pain were not credible largely because they were inconsistent with the record as a whole and particularly with her own reports of her activities. This conclusion was reasonable and supported by substantial evidence.

2. *Treating Source Opinions*

Vest points out that her statements about the severity of her pain are supported by the opinions of her doctors. (Pl. Br. 5, 8–9.) The ALJ rejected the opinions of Vest's treating rheumatologist, Dr. Hogenmiller, and her treating primary care physician, Dr. Gray. (R. 38.) The ALJ explained that he rejected Dr. Hogenmiller's opinions because they were "on an issue of disability reserved to the commissioner" and because they were "not supported by the longitudinal record with its limited physical findings and generally routine and conservative treatment." (R. 38.) He rejected Dr. Gray's opinions contained on the April 2008 Medical Evaluation form because they were conclusory and inconsistent with his treatment notes. (R. 38.) He rejected Dr. Gray's 2010 disability endorsement letter because it was on an issue of disability reserved to the commissioner. (R. 38.) Finally, he noted that Dr. Hogenmiller and Dr. Gray's opinions were "more based on the claimant's reported symptoms and limitations, rather than on objective findings and diagnostic test results." (R. 38.) Earlier in his opinion, the ALJ observed

---

[15] Congress has abrogated the "heart of the claim" standard by statute in asylum cases. *See Tassi v. Holder*, 660 F.3d 710, 716 n.6 (4th Cir. 2011).

that if Vest's "physicians … were fully aware of the claimant's credibility question, that undoubtedly would have impacted their opinions about her health condition." (R. 37.)

The ALJ's explanation for rejecting these doctors' opinions was more than adequate. As the ALJ noted, the opinions that Dr. Hogenmiller provided on the Fibromyalgia RFC Questionnaire were inconsistent with his medical records and at times bordered on ridiculous. (R. 38.) For example, Dr. Hogenmiller indicated that during an eight-hour work day Vest could never look down, look up, turn her head left or right, or hold her head in a static position. (R. 837.) As the ALJ pointed out, this leaves Vest nothing to do with her head for eight hours. (R. 38.) Likewise, Dr. Hogenmiller's statement that Vest could finger, handle, or reach only 1% of the time (i.e., roughly five minutes during an eight-hour day) was flatly contradicted by Vest's statement to him two weeks earlier that she was able to shop and wrap gifts. (R. 38, 812, 838.) Given the gross exaggerations in Dr. Hogenmiller's assessment, the ALJ certainly did not err in rejecting it in its entirety. Similarly, the ALJ appropriately considered Dr. Gray's treatment notes in discounting his conclusory opinions that Vest was disabled. (R. 38, 599, 681, 785, 1537.)

Furthermore, the ALJ properly noted that the opinions of Vest's doctors' were based largely on her subjective complaints and that as such their persuasiveness was limited by Vest's credibility. As the ALJ pointed out, "[s]ince there are no objective tests for pain…, physicians … must rely heavily on their patients' credibility." (R. 37.) Here, the ALJ found Vest's testimony about the severity of her pain not credible and offered a number of reasons for that finding. The opinions of Vest's doctors do not undermine that finding, nor do they find substantial support in those doctors' treatment notes. Accordingly, the ALJ could afford less weight to their opinions because they were based on statements he reasonably found to be not credible. *Mastro* 270 F.3d at 177–78; *Craig*, 76 F.3d at 590; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir.

2008) ("An ALJ may reject a treating physician's opinion if it is based to a large extent on a claimant's self-reports that have been properly discounted as incredible.").[16]

Accordingly, I find that substantial evidence supports the ALJ's assessment of Vest's credibility and his decision to rejet the opinions of Dr. Hogenmiller and Dr. Gray.

## V.   Conclusion

For the reasons stated above, I respectfully recommend that Vest's motion for summary judgment (ECF No. 13) be GRANTED, her supplemental motion for summary judgment (ECF No. 21) be DENIED as MOOT, the Commissioner's motion for summary judgment (ECF No. 18) be DENIED, and this case be REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk

---

[16] Under the heading, "Vocational Evidence supports a finding of disability," Vest contends that the ALJ's finding that she can perform sustained work activities "is not supported by substantial evidence" because "[t]he ALJ simply excluded her subjective symptoms … and her treating physicians' opinions in determining her RFC." (Pl. Br. 11–12.) This argument fails for the same reason her RFC argument fails—the ALJ in fact considered her subjective symptoms and provided sufficient reasons for discounting her treating physicians' opinions.

is directed to transmit the record in this matter to the Honorable Michael F. Urbanski, United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER:  July 17, 2014

Joel C. Hoppe
United States Magistrate Judge